# United States Court of Appeals
## For the First Circuit

No. 09-1847

DAVID EDUARDO CASTAÑEDA-CASTILLO;
CARMEN JULIA DE LA CRUZ-CASTAÑEDA;
PIERA DINA CASTAÑEDA,

Petitioners,

v.

ERIC H. HOLDER, JR.,
UNITED STATES ATTORNEY GENERAL,

Respondent.

APPLICATION FOR ATTORNEY'S FEES
UNDER EQUAL ACCESS TO JUSTICE ACT

Before

Torruella, Ripple[*] and Lipez,
Circuit Judges.

William P. Joyce, with whom Joyce & Associates P.C., was on brief for petitioners.
Matt A. Crapo, Attorney, Office of Immigration Litigation, Civil Division, U.S. Department of Justice, with whom Tony West, Assistant Attorney General, Civil Division, and Michelle Gorden Latour, Assistant Director, were on brief for respondent.

July 17, 2013

---

[*] Of the Seventh Circuit, sitting by designation.

**TORRUELLA, Circuit Judge.** This is the sixth (and hopefully the final) installment of Petitioner David Eduardo Castañeda's tumultuous voyage through our nation's immigration system. Castañeda began his journey more than twenty years ago, when he arrived in the United States seeking political asylum based on the alleged persecution he suffered at the hands of the Shining Path, a ruthless guerrilla organization bent on overthrowing the government of Perú. On February 6, 2012, after his case generated three court-of-appeals opinions, one district court opinion, and numerous administrative determinations, an Immigration Judge (IJ) finally granted asylum to Castañeda and his family members. Subsequently, on April 12, 2012, we entered final judgment closing Castañeda's case. See Castañeda-Castillo v. Holder, 676 F.3d 1 (1st Cir. 2012) ("Castañeda V"). In so doing, we cautioned that we were taking "no position on the deadline for filing, or potential merit of, an application for attorneys' fees under the Equal Access to Justice Act." Id. at 3. On July 12, 2012, Castañeda filed such a petition, seeking to be awarded the attorneys' fees he incurred while litigating his case in federal court, as well as the attorneys fees related to the administrative proceedings he underwent. After careful consideration, we grant his petition in part and deny it in part.

## I. Background

The full history of this case is chronicled in the four prior opinions of this court and one opinion of the U.S. District Court for the District of Massachusetts. See Castañeda-Castillo v. Gonzales, 464 F.3d 112 (1st Cir. 2006) ("Castañeda I"); Castañeda-Castillo v. Gonzales, 488 F.3d 17 (1st Cir. 2007) (en banc) ("Castañeda II"); United States v. Castañeda-Castillo, 739 F. Supp. 2d 49 (D. Mass. 2010) ("Castañeda III"); Castañeda-Castillo v. Holder, 638 F.3d 354 (1st Cir. 2011) ("Castañeda IV"); and Castañeda V, 676 F.3d 1. The following relevant facts are culled from those decisions.

### A. The Accomarca Massacre

Castañeda, a former lieutenant in the Peruvian army, was accused of taking part in the massacre of innocent villagers in Accomarca, Perú (the "Accomarca Massacre") in 1985, during the country's bloody struggle with the revolutionary Shining Path movement. Castañeda II, 488 F.3d at 19. Castañeda led one of the four patrols involved in the Accomarca operation but was three to five miles away from the massacre, id., and was not in any way involved in, or responsible for, the heinous actions of the larger force. Castañeda IV, 638 F.3d at 357; Castañeda II, 488 F.3d at 19. The Peruvian Senate Human Rights Commission investigated the events and determined that Castañeda's squad "was not involved in any confrontations with [the] fugitive civilians" who were killed.

-3-

Castañeda II, 488 F.3d at 19.  Despite this finding, Castañeda was charged with homicide and abuse of authority before a military tribunal, although said charges were ultimately dismissed. Castañeda V, 676 F.3d at 2.  The dismissal was affirmed by the Supreme Council of Military Justice, Perú's highest court with jurisdiction over military justice matters.  See id.; Castañeda III, 739 F. Supp. 2d at 52.[1]  Notwithstanding, Castañeda's name became associated with the Massacre, and he and his family began receiving death threats from the Shining Path, Castañeda IV, 638 F.3d at 357-58, a violent group that "is among the world's most ruthless guerrilla organizations," Castañeda I, 464 F.3d at 114 n.3.  Thereafter, members of the Shining Path sent death threats to Castañeda, attempted to murder him twice and to kidnap one of his daughters, and set off explosives in front of his parent's home. Castañeda I, 464 F.3d at 120-21.  In fact, a bomb that went off shortly after he left a restaurant with his family killed several innocent bystanders.  Castañeda IV, 638 F.3d at 358.  In 1991, following the murder of his neighbor, a former military officer who apparently was also in the Shining Path's cross-hairs, Castañeda and his family decided to flee Perú, and they arrived in the United States on tourist visas.  Castañeda I, 464 F.3d at 120-21.

---

[1]  In fact, several of the officers in the other patrols were charged and convicted in Peruvian military tribunals. Castañeda III, 739 F. Supp. 2d at 52.

-4-

**B. The Petition for Asylum; Castañeda I and II**

In 1993, Castañeda filed the petition for asylum that gave rise to the instant saga. Castañeda V, 676 F.3d at 2.[2] It was not until 2004 that the petition was denied by an IJ, who found that Castañeda was barred from applying for asylum and withholding of removal because he had participated in the persecution of others on account of their political opinion, given his presumed role in the military during the Accomarca Massacre. Id. The Board of Immigration Appeals (BIA) affirmed in 2005. Id. Castañeda was subsequently incarcerated and spent the next five years in the Department of Homeland Security's (DHS) custody, until he was finally released on bail in August 2010. Id. In the meantime, Castañeda pursued a petition for review before us challenging the BIA's denial of his petition for asylum (the "first petition for review"). Said petition gave rise to our decision in Castañeda I, where we found that the BIA's determination that Castañeda had engaged in the persecution of others was not supported by substantial evidence. Castañeda I, 464 F.3d at 137. Subsequently, we granted the government's request to rehear the case en banc, which resulted in our decision in Castañeda II. There, we held that for the persecutor bar to apply to Castañeda, he must have had prior or contemporaneous knowledge that his actions during the

---

[2] Castañeda listed his wife and two daughters as derivative beneficiaries.

-5-

Accomarca Massacre had the effect of assisting in the persecution of others. Castañeda II, 488 F.3d at 21-22. We remanded the case back to the immigration agencies for them to determine whether Castañeda was credible when he denied having said knowledge. Id. at 24-26.

Following remand, the IJ again denied Castañeda's application for asylum and withholding of removal, holding that (1) he had not met his burden of proving that he did not persecute others; (2) he had not established that he was persecuted on account of his membership in a particular social group or because of his political opinion; and (3) he had not established that he had an objectively reasonable fear of future persecution. Castañeda IV, 638 F.3d at 359. In May 2009, the BIA reversed the IJ as to point (1), concluding that there was insufficient evidence to support the IJ's finding that Castañeda had prior or contemporaneous knowledge of the Accomarca Massacre. Id. Nevertheless, the BIA upheld the IJ's decision as to points (2) and (3), reasoning that the Shining Path did not target Castañeda because he was a member of a particular social group -- members of the military who were linked to the Accomarca Massacre -- rather, they targeted him out of revenge for the massacre. Id. at 362-63. The BIA then found that Castañeda failed to prove that he had a genuine fear of future persecution were he to return to Perú and thus denied his application for asylum. Id. at 359.

-6-

### C. Castañeda IV

In June 2009, Castañeda filed a petition for review of the BIA's ruling before this court (the "second petition for review"). Said petition gave rise to our decision in Castañeda IV, where we held that the BIA committed legal error when it reasoned that the Shining Path's vindictive motivation precluded a finding of persecution on account of a statutorily protected ground. Id. at 363. In light of the "ordinary remand rule," we sent the case back to the BIA for consideration of whether "Peruvian military officers whose names became associated with the Accomarca massacre" constituted a cognizable social group. Id. We emphasized, however, that the "unusually prolonged and convoluted history of this case prompt[ed] us to take the further step of retaining jurisdiction over Castañeda's appeal while the BIA addresses these issues on remand." Id.

On October 11, 2011, the BIA ruled that military officers linked to the Accomarca Massacre comprised a cognizable social group and that Castañeda suffered past persecution due to his membership in such a group. Castañeda V, 676 F.3d at 3. The case was remanded to the IJ so that she could determine whether the government could rebut the presumption that Castañeda harbored a well-founded fear of persecution if he were to return to Perú. Id. On February 6, 2012, an IJ granted asylum to Castañeda and his

family, effectively laying to rest an application for asylum that had been pending for almost twenty years.  Id.

### D. Castañeda V

Castañeda's legal battles, however, were not over.  He returned to this court and filed a motion requesting that we enter a final judgment in his favor, noting that, in Castañeda IV, this court had elected to retain jurisdiction over the post-remand proceedings, and that it was now time to "officially terminate this [c]ourt's jurisdiction."  In response, the government argued that we had no authority to issue a final judgment, because we "lack[ed] jurisdiction to pass judgment on the merits of this case."  Id.  It maintained that Congress granted courts of appeals jurisdiction to review only final orders of removal, and that, as the IJ's decision to grant asylum to Castañeda was not such an order, we lacked jurisdiction to enter a final judgment effectively sanctioning her award of asylum as final.

In Castañeda V, we rejected that argument.  676 F.3d at 1.  We explained that when we remanded this case to the BIA in Castañeda IV, we "explicitly retained jurisdiction for the express purpose of ensuring a speedy resolution of this case."  Id. at 3. As such, we dismissed as moot the petition for review over which we had retained jurisdiction in Castañeda IV, and directed the clerk of the court to issue a final judgment in Castañeda's favor.  Id.

The clerk of the court entered said judgment on April 12, 2012, the same date that Castañeda V was decided.

### E.    The Extradition Proceedings

During the pendency of Castañeda's second petition for review, on March 9, 2010, the government filed a request for the extradition of Castañeda to his native Perú. Castañeda III, 739 F. Supp. 2d at 50. The request stemmed from the government of Perú's renewed decision to charge Castañeda with the crimes of aggravated murder, kidnapping and forced disappearance arising from the events surrounding the Accomarca Massacre. This request was the result of a change in Perú's government and the revocation of an amnesty law passed in 1995 which protected members of the military from further prosecution. Id. at 52. No effort was made to extradite Castañeda until five years after the new Peruvian government filed charges against him. Id. at 53. Nevertheless, the government argued before the federal district court in Massachusetts that Castañeda should be held in custody without bail until a determination of extraditability was made under 18 U.S.C. § 1834. Id. at 50. On August 17, 2010, the district court in Castañeda III granted Castañeda's request to be released on bail, finding that he had established special circumstances warranting such relief. Id. at

63-64.  The government ultimately decided to voluntarily dismiss the extradition proceedings against Castañeda in April 2011.[3]

### F.  The Habeas Corpus Proceedings

Castañeda also filed a petition for a writ of habeas corpus with the district court on February 2010, noting that he had been detained by DHS for nearly four and a half years while he waited for his asylum application to be adjudicated, despite having no criminal history and not being subject to mandatory detention. Given the extradition request, Castañeda was transferred to the custody of the U.S. Marshal service, and the government moved for the dismissal of the habeas petition on the grounds that Castañeda had named the wrong custodian, presumably the DHS.  However, as previously recounted, Castañeda ended up being released on bail on August 2010, in the context of his extradition proceeding.

## II. The Petition for Attorneys' Fees

Having dotted the tortured factual landscape, we now proceed to discuss Castañeda's petition for attorneys' fees.

---

[3]  Since American courts normally give deference to decisions of foreign tribunals, Casey v. Dep't of State, 980 F.2d 1472, 1477 (D.C. Cir. 1992)(discussing deference given to a determination of a foreign court in extradition proceeding), this was probably a recognition that Castañeda's new charges in Perú were likely to be dismissed under Peruvian double jeopardy principles. See Castañeda IV, 638 F.3d at 361.

On July 12, 2012, Castañeda filed the amended petition for attorneys' fees that is now before us.[4] He first seeks an award for fees he incurred in relation to his first petition for review of the BIA's September 9, 2005 removal order, which resulted in this court's decisions in Castañeda I and Castañeda II (en banc). Second, Castañeda seeks an award of attorneys' fees incurred in relation to his second petition for review of the BIA's May 26, 2009 removal order, which resulted in this court's decisions in Castañeda IV and Castañeda V. In addition to seeking an award with respect to those four decisions, Castañeda seeks an award of attorney's fees and expenses incurred during the post-remand administrative removal proceedings that took place after the remands ordered in Castañeda II and Castañeda IV. Castañeda also seeks an award of attorneys' fees and expenses incurred during the extradition and habeas proceedings that were

---

[4] Castañeda had filed an earlier petition for attorneys' fees on April 6, 2012. The main difference between the two petitions seems to be that, in the amended petition, Castañeda argues for a fee enhancement under the EAJA. See 28 U.S.C. § 2412(d)(2)(A). It is also worth noting that Castañeda's attorneys worked on this case on a pro bono basis, and that he maintains that this should not be an impediment to an award under the EAJA. The government does not dispute this, and the case law seems to support Castañeda in this regard. See Blum v. Stenson, 465 U.S. 886, 894-95 (1984) ("It is also clear from the legislative history [of an analogous fee-shifting statute, 42 U.S.C. § 1988] that Congress did not intend the calculation of fee awards to vary depending on whether plaintiff was represented by private counsel or by a nonprofit legal services organization."). We therefore hold that Castañeda may petition this court for attorneys' fees, even though his attorneys worked on his case on a pro bono basis.

conducted before the district court, as well as during several administrative bond proceedings that were conducted before the Executive Office for Immigration Review ("EOIR"). Finally, Castañeda also seeks to be awarded the fees incurred during the preparation of both his original and amended application for attorneys' fees.

### III. **The Equal Access to Justice Act**

In the United States, each party is usually required to bear its own attorneys' fees; "the prevailing party is not entitled to collect them from the loser." Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't. of Health & Human Res., 532 U.S. 598, 602 (2001). The Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412, is an exception to that rule. It provides in part that

> a court shall award to a prevailing party . . . fees and other expenses . . . incurred by that party in any civil action . . . including proceedings for judicial review of agency action, brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

28 U.S.C. § 2412(d)(1)(A). The EAJA aims to "ensure that certain individuals . . . will not be deterred from seeking review of, or defending against, unjustified governmental action because of the expense involved." Aronov v. Napolitano, 562 F.3d 84, 88 (1st Cir. 2009) (citing Scarborough v. Principi, 541 U.S. 401, 407 (2004)). The Act "reduces the disparity in resources between individuals .

-12-

. . and the federal government." Id. (citing H.R. Rep. No. 99-120(I), at 4 and 1985 U.S.C.C.A.N. at 133). Nevertheless, since it effectively amounts to a partial waiver of sovereign immunity by the United States, its scope must be strictly construed in favor of the government. Ardestani v. I.N.S., 502 U.S. 129, 137 (1991).

The EAJA also mandates that a party seeking an award of attorneys' fees must submit his petition "within thirty days of final judgment in the action." 28 U.S.C. § 2412(d)(1)(B). Consequently, in order for Castañeda to prove himself eligible for an award of attorneys' fees under the EAJA, he must establish (1) that he is the prevailing party in the civil action; (2) that his petition was timely filed; (3) that the government's position was not substantially justified; and (4) that no special circumstances make an award against the government unjust. Comm'r, I.N.S. v. Jean, 496 U.S. 154, 158 (1990); Norris v. S.E.C., 695 F.3d 1261, 1264 (Fed. Cir. 2012).

## IV. Eligibility Under EAJA

We now proceed to discuss whether Castañeda meets the four requirements listed above. We do so in turn.

### A. Prevailing Party Status

#### 1. Applicable Law

The term "prevailing party," as used in the EAJA and other fee-shifting statutes, is a "legal term of art." Buckhannon,

-13-

532 U.S. at 603.[5]  To be considered a prevailing party, a party must be "awarded some relief by the court."  Id.  The party must also show (1) a "material alteration of the legal relationship of the parties" and (2) a "judicial imprimatur on the change."  Aronov, 562 F.3d at 89.  The Supreme Court has held that there are only two situations that meet the judicial imprimatur requirement: (1) where the party has "received a judgment on the merits" or (2) where the party "obtained a court-ordered consent decree."  Buckhannon, 532 U.S. at 605.  A party's mere success in accomplishing its objectives, however, is insufficient to confer it prevailing party status.  Id. at 606; Aronov, 562 F.3d at 89.

## 2. Discussion

The government recognizes that Castañeda is the prevailing party in Castañeda II and Castañeda IV, but not in Castañeda V.  It argues that our decision to issue a final judgment in Castañeda V did not confer upon Castañeda the status of prevailing party, because said decision did not effectively "rule on the merits" of Castañeda's second petition for review.  The government stresses that this court had already ruled on the merits of such a petition in Castañeda IV, and that, following the remand

---

[5]  The Supreme Court in Buckhannon interpreted the term "prevailing party" as used in other fee-shifting statutes, namely those present in the Fair Housing Act Amendments of 1988, 42 U.S.C. § 3613(c)(2) and the Americans with Disabilities Act, 42 U.S.C. § 12205.  Nevertheless, the Supreme Court's interpretation is "presumed to apply generally to all fee-shifting statutes that use the prevailing party terminology."  Aronov, 562 F.3d at 89.

ordered in that case, the immigration agencies had independent authority to grant Castañeda asylum.  Once the decision was made by an IJ to grant Castañeda asylum, the argument goes, such decision did not depend on this court's judicial imprimatur or approval in the form of a final judgment.  Therefore, the government argues that the parties' legal relationship remained the same both before and after we entered final judgment in <u>Castañeda V</u>, and that such judgment cannot confer prevailing party status upon Castañeda under the EAJA.

Castañeda, for his part, argues that he is the prevailing party in each of the proceedings of <u>Castañeda I</u>, <u>Castañeda II</u>, <u>Castañeda IV</u> and <u>Castañeda V</u>.  He claims that the government has mistakenly considered <u>Castañeda IV</u> and <u>Castañeda V</u> to be two separate cases, when in reality they are not, because this court did not issue a mandate after the <u>Castañeda IV</u> decision; instead, it decided to retain jurisdiction and refrain from terminating that proceeding.[6]  As such, Castañeda argues the decisions in <u>Castañeda IV</u> and <u>Castañeda V</u> should be construed as forming part of the same "civil action" under the EAJA, an action which was not terminated until after <u>Castañeda V</u>.  Therefore, Castañeda maintains he became a prevailing party in <u>Castañeda V</u>, when this court noted its

---

[6]  This court did issue a mandate after our decision in <u>Castañeda IV</u>, but that mandate was later recalled as having been issued in error.

previous findings in Castañeda IV, entered a final judgment and issued a mandate effectively terminating the case.

We agree with Castañeda that he should be accorded prevailing party status with respect to Castañeda V. In reaching our conclusion, we have found instructive the Federal Circuit's ruling in Former Employees of Motorola Ceramic Products v. United States, 336 F.3d 1360 (Fed. Cir. 2003). There, a pair of employees who had been dismissed from their respective employments petitioned the Department of Labor (DOL) for benefits. Id. at 1362. The DOL denied their petitions and the employees sought review before the Court of International Trade (CIT). Id. The CIT found the DOL's decision to be erroneous and thus remanded the case back to the DOL for reconsideration, but retained jurisdiction over the proceedings during remand. Id. The employees were granted their benefits and afterwards filed an application for attorneys' fees pursuant to the EAJA. Id. at 1363. The CIT denied the petition, holding that its remand to the DOL did not constitute a judgment on the merits that afforded prevailing party status to the employees, and the employees appealed to the Federal Circuit. Id.

In order to determine whether the CIT's remand order to the DOL constituted relief on the merits, the Federal Circuit relied on the Supreme Court's holdings in Sullivan v. Hudson, 490 U.S. 877 (1989) and Shalala v. Schaefer, 509 U.S. 292 (1993), and distilled the following rule:

where the plaintiff secures a remand requiring further agency proceedings because of alleged error by the agency, the plaintiff qualifies as a prevailing party (1) without regard to the outcome of the agency proceedings where there has been no retention of jurisdiction by the court, or (2) when successful in the remand proceedings where there has been a retention of jurisdiction.

Former Emps., 336 F.3d at 1366.[7]  It follows that, under the second prong of the rule, a court's remand order to an administrative agency, with retention of jurisdiction, creates a prevailing party "if the party obtains the benefits it sought before the agency." Id. at 1367 (our emphasis); see also Flom v. Holly Corp., 276 F. App'x 615, 617 (9th Cir. 2008) (citing Former Employees with approval).  The court thus found that the employees qualified as prevailing parties under this prong, because they obtained relief at the DOL after the CIT had remanded the case due to the agency's error.  Former Emps., 336 F.3d at 1367.

In the case at bar, our remand order in Castañeda IV explicitly stated that we were to retain jurisdiction during the agency proceedings, due to the "unusually prolonged and convoluted history of this case." Castañeda IV, 638 F.3d at 363.  There is no doubt that a material alteration of the relationship between the parties occurred when an IJ granted Castañeda his request for asylum.  However, in order to become a prevailing party, there must have been a "judicial imprimatur" of that change.  That imprimatur

---

[7]  The cases of Hudson and Schaefer will be discussed infra.

-17-

did not come until our decision in <u>Castañeda V</u>, when we acknowledged that "all factual and legal issues relating to Petitioners' eligibility for asylum [had] now been resolved in their favor by the administrative agency" and directed the clerk of the court to issue a final judgment. <u>Castañeda V</u>, 676 F.3d at 2. In essence, the final judgment we entered pursuant to <u>Castañeda V</u> is the final judgment "on the merits" we would have entered after deciding <u>Castañeda IV</u>, were it not for our decision to retain jurisdiction over the ensuing agency proceedings. In requesting that this court enter such a final judgment, Castañeda correctly attempted to comply with the strictures of the <u>Buckhannon</u> decision, which required him to secure a judgment on the merits or a court-approved settlement in order to be considered a prevailing party. 532 U.S. at 605-06. He achieved the desired result and thus became a prevailing party once the final judgment was entered.

As can be seen, in arriving at this conclusion we have traveled down a similar path to the one followed in <u>Former Employees</u>, except that we consider that Castañeda only became a prevailing party when, per his request, we entered a final judgment pursuant to <u>Castañeda V</u>. We think this was a necessary step, given <u>Buckhannon</u>'s requirement that there be a "judgment on the merits," <u>id.</u>, and the Supreme Court's holding in <u>Melkonyan</u> v. <u>Sullivan</u>, 501 U.S. 89, 94 (1991), that a "final judgment" under the EAJA "can only be the judgment of a court of law."

-18-

**B. Timeliness**

**1. Background**

The government's second argument is that Castañeda's petition for attorneys' fees is untimely under 28 U.S.C. § 2412(d)(1)(B). Said provision states that a proper application for attorneys' fees must be submitted "within thirty days of final judgment in the action." Id. A "final judgment" is defined by the EAJA as a judgment that is final and unappealable. Id. at § 2412(d)(2)(G). Castañeda notes that this court elected to retain jurisdiction after its decision to remand in Castañeda IV, which was decided on March 24, 2011. Following remand, Castañeda was able to prevail and obtain asylum in the immigration agencies, and he thus returned to this court requesting that we enter a final judgment in his favor. We entered such a final judgment, according to our own terms, on April 12, 2012, pursuant to our order in Castañeda V. Therefore, Castañeda argues that said judgment became a "final judgment," within the meaning of the EAJA, on July 11, 2012, when the period for seeking certiorari to the Supreme Court expired. See Sup. Ct. R. 13.1. The decision to remand in Castañeda IV, according to him, also became final and unappealable as of that date, because this court retained jurisdiction over his petition for review pending the completion of the post-remand administrative proceedings at the immigration agencies. Consequently, as he filed his amended petition for attorneys' fees

-19-

the day after, on July 12, 2012, Castañeda claims he is well within the 30-day time period allowed by the EAJA.

The government, for its part, claims that Castañeda's petition is untimely. It counters that if Castañeda wanted to recover attorneys' fees for the proceedings that led to the decision in Castañeda IV, he should have filed his petition by July 22, 2011, that is, 120 days after this court issued its judgment in that decision.[8] The government claims that the judgment issued pursuant to Castañeda IV became a "final judgment" under the EAJA on June 22, 2011, despite this court's decision to retain jurisdiction on the matter and forgo entering its own final judgment until Castañeda V was decided. In support of its contention, it cites to several Supreme Court cases which have interpreted when a judgment becomes "final" for EAJA purposes, but those cases deal with judicial review of Social Security Administration ("SSA") cases under 42 U.S.C. § 405(g) by the district courts. The government, nevertheless, relies on those cases to argue that this court was stripped of its ability to retain jurisdiction over Castañeda's petition for review following

---

[8]  On the same date we issued our decision in Castañeda IV, the clerk's office issued a judgment decreeing that we had vacated the decision of the BIA and remanded the case for further proceedings consistent with the opinion. The government arrives at the 120-day total by adding the 90 days it took for the Castañeda IV judgment to become final and unappealable, per Sup. Ct. R. 13.1, and the 30 days provided by the EAJA to file a petition for attorneys fees, per 28 U.S.C. § 2412(d)(1)(B).

our remand order in <u>Castañeda IV</u>, and that instead we were supposed to enter a final judgment relinquishing jurisdiction on the matter, thereby triggering the 120-day time period to file a petition for attorneys' fees under the EAJA.

### 2. Supreme Court Jurisprudence on Judicial Review of SSA Cases

In order to understand the government's argument, it is necessary to provide a brief summary of the specialized nature of judicial review of SSA agency determinations. In SSA cases, a district court reviewing a decision rendered by an SSA agency may only remand a case back to that agency under either sentence four or sentence six of section 405(g). <u>See</u> <u>Melkonyan</u>, 501 U.S. at 90. Under sentence four of section 405(g), the district court must enter "a judgment, affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing," 42 U.S.C. § 405(g), whereas under sentence six, the district court "does not rule in any way as to the correctness of the administrative determination," but instead remands the case to the agency for further fact finding, <u>Melkonyan</u>, 501 U.S. at 98.[9] Further, following a sentence six remand, the agency "must return to the district court to 'file with the court

---

[9] Sentence six of section 405(g) provides that "[t]he court may . . . remand the case to the Commissioner of Social Security for further action by the Commissioner of Social Security, and it may at any time order additional evidence to be taken before the Commissioner of Social Security . . . ." 42 U.S.C. § 405(g).

any such additional or modified findings of fact and decision,'" along with a supplemental record of the post-remand proceedings. Id. (quoting 42 U.S.C. § 405(g)).

The Supreme Court distinguished between sentence four and sentence six remand orders for the first time in Sullivan v. Finkelstein, 496 U.S. 617 (1990). In Finkelstein, a case that did not concern the EAJA, the SSA agency had denied a widow's application for disability benefits, and the widow sought review in the district court under section 405(g). The district court reversed in part the decision of the SSA agency and remanded the case so that the agency could determine whether the widow could engage in any gainful activity. The Secretary of Health and Human Services appealed to the court of appeals, but said court dismissed the appeal for lack of jurisdiction, reasoning that the district court's decision to remand the case to the SSA agency was not an appealable "final decision" under 28 U.S.C. § 1291. On certiorari, the Supreme Court differed and held that the district court's remand was a sentence four remand under section 405(g), and that said type of remand order is an appealable final decision. The Court reasoned that the district court's order was "unquestionably" a judgment because "it terminated the civil action challenging the Secretary's final determination that [the] respondent was not entitled to benefits, set aside that determination, and finally decided that the Secretary could not follow his own regulations in

-22-

considering the disability issue." Id. at 625. The Court ruled that sentence four of section 405(g) "directs the entry of a final, appealable judgment even though that judgment may be accompanied by a remand order." Id. at 629 (our emphasis). It placed much emphasis on the fact that sentence eight of section 405(g) provides that "[t]he judgment of the court shall be final except that it shall be subject to review in the same manner as a judgment in other civil actions." Id. at 625 (emphasis in original).

A year after Finkelstein was decided came the Supreme Court's decision in Melkonyan, where the Court was faced with the question of whether an administrative decision rendered following a remand from a district court could be a "final judgment" within the meaning of the EAJA. The Court answered in the negative, holding that the "plain language [of the EAJA] makes clear that a 'final judgment' under § 2412 can only be the judgment of a court of law." Melknonyan, 501 U.S. at 94 (quoting 28 U.S.C. § 2412(d)(1)(B)). According to the Court, "[i]n sentence four [remand] cases, the [EAJA] filing period begins after the final judgment ('affirming, modifying, or reversing') is entered by the [district] court and the appeal period has run, so that the judgment is no longer appealable." Id. at 102 (quoting 42 U.S.C. § 405(g) and citing 28 U.S.C. § 2412(d)(2)(G)). On the other hand, the Court clarified that the EAJA filing period in sentence six remand cases "does not begin until after the post-remand

proceedings are completed, the Secretary returns to court, the court enters a final judgment, and the appeal period runs." Id. The Court then concluded that "in § 405(g) actions, remand orders must either accompany a final judgment affirming, modifying or reversing the administrative decision in accordance with sentence four, or conform with the requirements outlined by Congress in sentence six." Id. at 101-02 (emphasis added).[10]

Two years later, in Schaefer, the Supreme Court reviewed an EAJA application for attorneys' fees filed after the district court remanded an SSA case pursuant to sentence four of section 405(g). Schaefer is significant because the district court in that case clarified that, although it was remanding the case under sentence four, it retained jurisdiction and planned to enter a final sentence four judgment after the completion of the post-remand administrative proceedings. 509 U.S. at 295. The EAJA applicant in that case thus argued that the "final judgment," for purposes of the EAJA, would be the final judgment entered by the district court after all post-remand proceedings were completed at the agency, and not the district court's order remanding the case back to the agency. Id. at 297. The Supreme Court rejected this argument, stating that it "was inconsistent with the plain language

---

[10] Nevertheless, the Melkonyan Court could not determine whether the petitioner's EAJA application was timely, as it was unclear what type of remand the district court had intended to carry out, so it remanded the case back to the lower courts for clarification.

-24-

of sentence four, which authorizes a district court to enter a judgment 'with or without' a remand order, not a remand order 'with or without' a judgment." Id. (quoting Finkelstein, 496 U.S. at 629). It further noted that a sentence four remand order constitutes a final judgment under the EAJA, as it "terminat[es] the litigation with victory for the plaintiff." Id. at 301. Thus, the Court held that the 30-day time period for filing an EAJA petition for attorneys' fees, following a sentence four remand, begins immediately upon expiration of the time to appeal said remand order. Id. at 297-98.

### 3. The Government's Arguments

The government contends that Schaefer, as well as the other Supreme Court cases mentioned above, compels the conclusion that remands in the immigration context should be treated the same way as remands in the social security context. Particularly, the government posits that our remands to the BIA in Castañeda II and Castañeda IV are akin to the remands authorized under sentence four of section 405(g). It emphatically calls our attention to case law from the Third, Seventh and Ninth Circuits, holding that remands to the BIA in immigration cases are analogous to the sentence four remands at issue in the Supreme Court's SSA cases. See Johnson v. Gonzales, 416 F.3d 205, 209-10 (3d Cir. 2005); Muhur v. Ashcroft, 382 F.3d 653, 654-55 (7th Cir. 2004); Rueda-Menicucci v. I.N.S., 132 F.3d 493, 495 (9th Cir. 1997). Therefore, the government

-25-

contends that, if Castañeda wanted to recoup the attorneys' fees and expenses he incurred in Castañeda II and Castañeda IV, he should have filed his petition for attorneys' fees within 30 days after the judgments issued in those cases became final and unappealable, that is, by September 20, 2007, and July 22, 2011, respectively.[11]  Instead, Castañeda filed his petition on July 12, 2012 (91 days after we issued our decision in Castañeda V) which is long after the judgments entered in Castañeda II and Castañeda IV "became final," according to the government's calculations.

The decision to retain jurisdiction following our remand in Castañeda IV, the government posits, is inconsistent with the Supreme Court's definition of a "final judgment" under the EAJA. According to the government's reading of the Supreme Court's jurisprudence, this court had to enter a final judgment after deciding Castañeda IV, because our decision there effectively ruled "on the merits" of Castañeda's petition for review, vacated the decision of the administrative agency, and remanded the case for further proceedings consistent with the opinion.  The government argues that, after this course of action, there was nothing left for this court to do but to relinquish jurisdiction and enter a

---

[11]  In effect, the government is arguing that Castañeda should have filed two petitions for attorneys' fees, one following our decision in Castañeda II, and another following our decision in Castañeda IV.

judgment on the merits, as commanded by sentence four of section 405(g) and <u>Schaefer</u>.

The government goes on to argue that, despite this court's decision to retain jurisdiction over the post-remand proceedings in <u>Castañeda IV</u>, it would have been able to appeal the judgment in that case as a "final order" under 28 U.S.C. § 1291. According to the government, the final judgment we entered in <u>Castañeda V</u> cannot make the <u>Castañeda IV</u> judgment appealable again, as the former did not purport to reaffirm the latter's ruling on the merits. Therefore, we are urged to construe the judgment entered pursuant to <u>Castañeda IV</u> as a "final judgment" for purposes of the EAJA, once the time period for seeking certiorari before the Supreme Court expired.

### 4. Castañeda's Arguments

Castañeda, for his part, argues that this court's remand in <u>Castañeda IV</u> should be construed as a sentence six remand, as opposed to a sentence four remand. He strenuously notes that this court elected to retain jurisdiction over the post-remand administrative proceedings following our decision in <u>Castañeda IV</u>, which according to him, effectively takes that remand outside of the purview of sentence four of section 405(g). Although he admits that sentence four requires a remanding court to relinquish jurisdiction over the matter and terminate the case on the merits, he points out that there is no similar provision in any of the

-27-

statutes governing judicial review of immigration cases. The Third, Seventh and Ninth Circuit cases relied upon by the government, he also claims, are distinguishable from his case, because in those cases each court plainly relinquished jurisdiction over the case when it remanded to the BIA.

In addition, following a sentence six remand, the SSA agency is required to return to the district court and file any additional or modified findings of fact, as well as its decision adjudicating the merits of the petitioner's claims, so that the court may review it and enter a final judgment on it. Castañeda theorizes that we attempted to do something similar in our Castañeda IV remand order, because although we did not require the BIA to make any additional findings of fact, we did direct the parties to file joint status reports on the progress of the administrative proceedings every sixty days. Castañeda claims that he expected to continue filing said reports until a final decision was reached at the immigration agencies, at which time he would file said decision with this court so that we could enter a final judgment on it, as required by sentence eight of section 405(g). Therefore, Castañeda urges us to treat the remand ordered in Castañeda IV as a sentence six remand, and the judgment entered pursuant to Castañeda V as a "final judgment" for EAJA purposes, once the period for seeking certiorari to the Supreme Court expired.

-28-

### 5. Analysis

We have not had the opportunity to consider the issue of what constitutes a final judgment for EAJA purposes when a court of appeals remands an immigration case for further administrative proceedings while retaining jurisdiction over those proceedings. The government here invites us to equate judicial remand orders in the immigration context with remand orders in the social security context. Particularly, the government urges us to apply the sentence four -- sentence six remand dichotomy to remands undertaken in the immigration context. We, however, find it difficult to accept the government's invitation in this regard.

First of all, in Tyler v. Fitzsimmons, we noted that "[w]hen acting outside the strictures of the Social Security statute, a reviewing court normally is not confined to two types of remand, but [rather] possesses the 'inherent' authority to condition its remand order as it deems appropriate." 990 F.2d 28, 32 n.3 (1st Cir. 1993) (citing Melknoyan, 501 U.S. at 101). This is because judicial remand orders in the social security context are governed by the detailed and inflexible language that Congress adopted in section 405(g). In contrast, judicial review of final orders of removal in the immigration context are governed by a different statute: section 242 of the Immigration and Nationality Act (INA), as amended by the Illegal Immigration Reform and

Immigrant Responsibility Act of 1996 (IIRIRA), 8 U.S.C. § 1252. In particular, section 242(a)(1) of the INA states that:

> Judicial review of a final order of removal (other than an order of removal without a hearing pursuant to [the expedited-removal provisions for undocumented aliens arriving at the border found in] section 1225(b)(1) of this title) is governed only by chapter 158 of Title 28 [known as the Hobbs Act], except as provided in subsection (b) of this section and except that the court may not order the taking of additional evidence under section 2347(c) of such title.

8 U.S.C. § 1252(a)(1).

The Hobbs Act, which is incorporated by the provision above, sets out the jurisdiction of the courts of appeals in reviewing agency orders. See 28 U.S.C. § 2349(a).[12] Needless to say, both the INA and the Hobbs Act employ starkly different language when it comes to regulating judicial remands to the immigration agencies, as compared to that used in section 405(g) to regulate remands to the SSA agencies. Despite this incongruity, the government urges us to adopt the sentence four -- sentence six

---

[12] Said provision states the following:

> The court of appeals has jurisdiction of the proceeding on the filing and service of a petition to review. The court of appeals in which the record on review is filed, on the filing, has jurisdiction to vacate stay orders or interlocutory injunctions previously granted by any court, and has exclusive jurisdiction to make and enter, on the petition, evidence, and proceedings set forth in the record on review, a judgment determining the validity of, and enjoining, setting aside, or suspending, in whole or in part, the order of the agency.

remand dichotomy featured in section 405(g), when no such dichotomy exists in either the INA or the Hobbs Act.  In so doing, the government has not pointed us to any language in the INA nor in the Hobbs Act which would support its proposition that this court lacked authority to retain jurisdiction over the post-remand administrative proceedings that followed our decision in Castañeda IV, and that we lacked authority to enter a final judgment in Castañeda V, thereby terminating the proceedings which had originated with Castañeda IV.

In any event, the parties' assertion that we could, in theory, remand an immigration case using a sentence-six-style remand is troublesome.  As already discussed, under sentence six of section 405(g), a district court "may at any time order additional evidence to be taken before the Commissioner of Social Security." 42 U.S.C. § 405(g).  However, remanding a case to an immigration agency with the purpose of having it collect additional evidence, at least at the behest of a petitioner, appears to be prohibited under a plain reading of section 242 of the INA, which states that "the court may not order the taking of additional evidence under section 2347(c) of [Title 28]."  8 U.S.C. § 1252(a)(1); see also I.N.S. v. St. Cyr, 533 U.S. 289, 312 n.36 (2001).[13]  It follows that

_____

[13]  Section 2347(c) allows any person that is a party to a petition for review to obtain permission from the court of appeals to adduce additional evidence, if that party can establish that: (1) the additional evidence is material; and (2) there were reasonable grounds for failure to adduce the evidence before the agency.  28

courts of appeals lack the authority to approve a party's request to remand a case back to the BIA so that said party may present additional evidence. See Najjar v. Ashcroft, 257 F.3d 1262, 1281 (11th Cir. 2001).

This is not to say that the government's argument is entirely without merit. We must recognize that the Third, Seventh and Ninth circuits have expressed a willingness to equate remands to the BIA in the immigration context with the sentence four remands featured in the social security context. But as Castañeda correctly points out, the remands at issue in those cases were ordered with a concomitant relinquishment of jurisdiction by the court. See, e.g., Johnson, 416 F.3d at 209-10 ("[The court of appeals] entered judgment in [petitioner's] favor and relinquished jurisdiction.") (emphasis added). Consequently, those circuits had no trouble likening those remands to the sentence four remands existing in the social security context. The fact remains that we have no way of knowing how those circuits would have ruled had the courts in those cases decided to retain jurisdiction over the post-remand proceedings.

Conversely, in our decision in Castañeda IV, we cited to cases from the Second and Seventh Circuits to support our authority to retain jurisdiction over the post-remand proceedings. See Ucelo-Gómez v. Gonzales, 464 F.3d 163, 172 (2d Cir. 2006)

U.S.C. § 2347(c).

(directing the BIA to issue an opinion responsive to the limited remand within forty-nine days, and retaining jurisdiction in the interim), Asani v. I.N.S., 154 F.3d 719, 725 (7th Cir. 1998)(retaining jurisdiction during a limited remand to the BIA to determine whether, inter alia, changed circumstances in the petitioner's home country supported a finding of a well-founded fear of future persecution); and Yang v. McElroy, 277 F.3d 158, 164 (2d Cir. 2002). Therefore, there is countervailing authority, at least from the Second and Seventh Circuits, that effectively undermines the government's position that we lacked the authority to retain jurisdiction in Castañeda IV.[14]

What's more, the law of the case doctrine governs on this issue. In Castañeda V, we explicitly rejected the government's argument that we were without authority to enter a final judgment

---

[14] The government also argues that it could have appealed our decision in Castañeda IV, despite our retention of jurisdiction. We note that our decision to retain jurisdiction in Castañeda IV, although unusual, is reconcilable with the Supreme Court's decisions in Schaefer, et al. In Finkelstein, the Supreme Court acknowledged that "the issue before us is not the broad question whether remands to administrative agencies are always immediately appealable. There is, of course, a great variety in remands, reflecting in turn the variety of ways in which agency action may be challenged in the district courts and the possible outcomes of such challenges." 496 U.S. at 623. We interpret this language to mean that not all remands to administrative agencies have to be immediately appealable, but rather, there seems to be room in "the great variety of remands" for remands to agencies while retaining jurisdiction over the underlying petition for review, at least in exceptional circumstances. As discussed earlier, those circumstances were clearly present here, because when Castañeda IV was decided, Castañeda's case had already been pending for almost two decades.

-33-

terminating the proceedings.  <u>Chi. & N.W. Transp. Co.</u> v. <u>United States</u>, 574 F.2d 926, 929 (7th Cir. 1978) ("Appellate reconsideration of issues that have already been decided in an earlier appeal is ordinarily foreclosed by the doctrine of law of the case.").[15]  In addition, by retaining jurisdiction over the post-remand proceedings in <u>Castañeda IV</u>, we instilled in Castañeda a legitimate expectation that, were he to prevail at the immigration agencies and obtain asylum, he could return to this court and seek the entry of a final judgment to effectively terminate the proceedings surrounding his petition for review. There is no reason to suppose that Castañeda did not reasonably believe that this potential final judgment would anchor the filing period for his EAJA attorneys' fees petition.  Adopting the government's argument to the contrary would effectively force us to backtrack from our decision to retain jurisdiction in <u>Castañeda IV</u> and to nullify the final judgment we entered pursuant to <u>Castañeda V</u>.  We reject this argument, primarily because it has no basis in either the INA or the Hobbs Act, and because adopting it would eviscerate the legitimate expectation we ourselves created in the mind of Castañeda.  Moreover, we are also mindful that the

---

[15] The government did not immediately object to this court's decision to retain jurisdiction in <u>Castañeda IV</u>.  It was not until January 2012, almost ten months after the publication of <u>Castañeda IV</u>, that the government filed a status report where, in a footnote, it challenged our authority to retain jurisdiction over the post-remand administrative proceedings.

legislative intent behind the EAJA counsels against creating confusion with regards to what constitutes a "final judgment" for purposes of the statute. See H.R. Rep. 99-120, n. 26 (provision of the EAJA defining "final judgment," 28 U.S.C. § 2412 (d)(2)(G), "should not be used as a trap for the unwary resulting in the unwarranted denial of fees.").

Based on the foregoing, we reject both the government's argument that we should treat the remand order in Castañeda IV as a sentence four remand, and Castañeda's argument that we should treat said remand as a sentence six remand. We agree with Castañeda, though, that the remand order in Castañeda IV is entirely distinguishable from the remands at issue in the cases decided by the Second, Seventh and Ninth Circuits. Accordingly, we hold that said remand should not be construed as a sentence four remand, and that the final judgment entered pursuant to Castañeda V should be treated as a "final judgment" under the EAJA, once the period for seeking certiorari before the Supreme Court expired. Since that occurred on July 11, 2012, and Castañeda filed his petition for attorneys' fees the day after, we deem that said petition is timely as to the proceedings that led to our decisions in Castañeda IV and Castañeda V.

### 6. Castañeda I and II

Castañeda also seeks an award for the attorneys' fees he incurred during the proceedings that led to our earlier decisions

-35-

in Castañeda I and II, arguing those fees may be included alongside the ones expended in Castañeda IV and V.[16] As recounted earlier, the government claims that if Castañeda wanted to recover the attorneys' fees he incurred in Castañeda I and II, he should have filed an EAJA petition on or before September 20, 2007, that is, 30 days after the judgment in Castañeda II became final and unappealable. In essence, the government believes that Castañeda was required to file two EAJA petitions for attorneys' fees, one for the proceedings that culminated in Castañeda II, and another for the proceedings that ended in Castañeda V. It claims that both sets of proceedings should be construed as separate "civil action[s]" under the EAJA, because they adjudicated different petitions for review and because this court did not retain jurisdiction over the post-remand administrative proceedings that followed Castañeda II. For the reasons that follow, we agree with the government.

Castañeda argues that requiring him to have filed two different petitions for attorneys' fees would be "wasteful, needlessly time consuming for the judicial system" and would "belie[] the underlying purpose of the EAJA, and def[y] a common sense approach to litigating EAJA claims." His argument here

---

[16] It is unclear to us whether Castañeda may recover the fees he incurred during Castañeda I, as that decision was vacated when we decided to grant the government's request for an en banc rehearing. In any case, since we find that Castañeda's petition is untimely as to both Castañeda I and II, we need not reach that issue.

mainly rests on two cases: (1) the Supreme Court's decision in Jean, 496 U.S. 154, and (2) the Second Circuit's decision in Gómez-Beleno v. Holder, 644 F.3d 139 (2d Cir. 2011). Specifically, Castañeda relies on language from Jean, where the Court stated that "the EAJA--like other fee-shifting statutes--favors treating a case as an inclusive whole, rather than as atomized line-items." 496 U.S. at 161-62. He argues that treating a case "as an inclusive whole" means treating both of his petitions for review as a single civil action under the EAJA, which in turn warrants finding his EAJA petition timely with respect to the fees incurred in Castañeda I and II.

We think Castañeda reads Jean too broadly. Said case did not involve a petitioner who was seeking a fee award for multiple petitions for review; rather, the issue at stake in Jean was whether a prevailing party could be barred from recovering the attorneys' fees it incurred during the fee litigation stage of the proceedings, if the government is able to prove that its position during that specific stage was substantially justified. 496 U.S. at 156. The Court answered that question in the negative, holding that the EAJA's "substantial justification" requirement is a "single finding that . . . operates as a one-time threshold for fee eligibility." Id. at 160. Therefore, the decision in Jean, which went more to the EAJA's "substantial justification" requirement,

rather than its statute of limitations, does not help Castañeda in this regard.

Castañeda also relies on Gómez-Beleno, where the Second Circuit treated two separate petitions for review as a single civil action for purposes of attorneys' fees under the EAJA. The court allowed the prevailing party in that case to recover the fees expended in both proceedings, even though the EAJA filing period for the first petition for review had already passed. The court in Gómez-Beleno, however, made it clear that the government did not argue that the two petitions for review in that case should have been treated as separate civil actions, and thus the argument was deemed to have been forfeited. 644 F.3d at 145 n.3.[17] Nevertheless, Castañeda points out that the court could have, motu

---

[17] The Second Circuit specifically stated that,

> Rather than file an earlier EAJA application following our disposition of the First Petition for Review, the Petitioners waited until after disposition of the Second Petition for Review to request fees and costs incurred in connection with both Petitions. If one were to construe the First and Second Petitions as giving rise to separate civil actions before this Court, then one might challenge the amount of the requested award, on the basis that it improperly includes fees and costs from a proceeding whose EAJA statute-of-limitations period expired well before this motion was filed . . . . But, "the EAJA—like other fee-shifting statutes—favors treating a case as an inclusive whole, rather than as atomized line-items." Commissioner, INS v. Jean, 496 U.S. 154, 161–62, 110 S.Ct. 2316, 110 L.Ed.2d 134 (1990). And the Government has not asserted that the First and Second Petitions should in this case be treated separately. We therefore deem any such argument forfeited. 644 F.3d at 145 n.3.

proprio, excluded the fees incurred by the petitioner during the first petition for review, based purely on the language contained in the EAJA's statute of limitations provision. The court declined to travel down that path and instead relied on Jean's "inclusive whole" language as an additional basis for upholding the award of fees in relation to the first petition for review. Id. As such, Castañeda invites us to follow the Second Circuit's lead and allow him to recover the fees incurred in both Castañeda I and II. We do not accept this invitation.

As previously discussed, we do not agree that Jean should be read as broadly as Castañeda and the Second Circuit seem to suggest. In addition, the Second Circuit may have ruled otherwise had the government decided to take up the issue. Instead, we find ourselves favoring the approach taken by the Third, Seventh and Ninth Circuits in Johnson, Muhur and Rueda-Menicucci, respectively, where those courts held that a judgment remanding a case to the BIA for further proceedings constitutes a final judgment for purposes of the EAJA's statute of limitations. The remands featured in those cases are exactly like the remand we ordered in Castañeda II; they were all issued after the circuit court reversed the BIA's erroneous denial of an asylum application and they were entered without the concomitant retention of jurisdiction that characterized our remand order in Castañeda IV. As such, we conclude that the judgment we entered pursuant to Castañeda II

should be construed as a final judgment for EAJA purposes, once the period for seeking certiorari before the Supreme Court had expired. Since Castañeda did not file an EAJA petition to recoup the fees expended in those proceedings, his current application must be denied as to those fees.

Our conclusion in this regard is further reinforced by the statutory language of the EAJA, its legislative history and common sense. The EAJA states that "[a] party seeking an award of fees and other expenses <u>shall</u>, within thirty days of final judgment <u>in the action</u>, submit an application for fees . . . ." 28 U.S.C. § 2412(d)(1)(B) (emphasis added). The Supreme Court has noted that the word "shall" ordinarily connotes an intention by Congress "to impose discretionless obligations." <u>López</u> v. <u>Davis</u>, 531 U.S. 230, 241 (2001); <u>Lexecon Inc.</u> v. <u>Milberg Weiss Bershad Hynes & Lerach</u>, 523 U.S. 26, 35 (1998) ("[T]he mandatory 'shall' . . . normally creates an obligation impervious to judicial discretion."); <u>Anderson</u> v. <u>Yungkau</u>, 329 U.S. 482, 485 (1947) (the term "shall" is "ordinarily [t]he language of command" (internal quotation marks omitted)). <u>But see</u> <u>Gutiérrez de Martínez</u> v. <u>Lamagno</u>, 515 U.S. 417, 432-33 n.9 (1995) ("Though 'shall' generally means 'must,' legal writers sometimes use, or misuse, 'shall' to mean 'should,' 'will,' or even 'may.'"). Given that the EAJA is a partial waiver of the government's sovereign immunity, and so must be strictly construed in favor of the government, <u>Ardestani</u>, 502 U.S. at 137, and that we

-40-

have described the EAJA's filing period as jurisdictional, Tyler, 990 F.2d at 30, we find that the word "shall" in this context means "must." See also Aronov, 562 F.3d at 88 ("Whatever flexibility there may be in interpreting fee shifting statutes involving awards against parties other than the United States, such flexibility does not exist as to EAJA applications." (citing Lehman v. Nakshian, 453 U.S. 156, 161 (1981))). Therefore, it follows that if Castañeda wanted to recover the fees he incurred during the proceedings leading up to Castañeda II, he "must" have filed an EAJA petition as to those proceedings on or before September 20, 2007, which is 30 days after the judgment in that civil action became final for EAJA purposes. Since Castañeda failed to do so, this court is without jurisdiction to entertain his present fee petition as to those proceedings.

Our holding is also driven by a desire to avoid confusion for parties and legal counsel engaged in litigating petitions for review such as the ones at issue here. Suppose that Castañeda had actually prevailed in the immigration agencies following our remand in Castañeda II. Most likely, his award of asylum would have been entered after the EAJA filing period for the Castañeda II judgment had passed. Castañeda would have thus found himself in a position where he could not recover the fees expended during the judicial proceedings leading up to Castañeda II, nor the fees expended during the subsequent post-remand administrative proceedings. He

could not have tethered his EAJA petition to the IJ's order granting him asylum, because said order would not qualify as a "final judgment" under the EAJA. See Melkonyan, 501 U.S. at 94 (stating that "a 'final judgment' under [the EAJA] can only be the judgment of a court of law."). Nor could he have relied on 5 U.S.C. § 504, a provision of the EAJA that allows prevailing parties to recover the fees incurred during administrative proceedings, because said provision does not apply to proceedings governed by the INA. See Ardestani, 502 U.S. at 137 (concluding that administrative immigration proceedings do not fall under 5 U.S.C. § 504).

One can easily see how adopting Castañeda's argument in this regard may leave similarly situated litigants at a dead end with respect to attorneys' fees if they fail to file a fee petition following a Castañeda II-type judgment and subsequently become prevailing parties at the agency level. Our holding here is meant to provide a clear time frame for filing a petition for attorneys' fees under the EAJA in the immigration context, and to avoid any confusion among the parties as to that time frame.

In summary, we find that we are without jurisdiction to award Castañeda the attorneys' fees he seeks with respect to Castañeda I and II. His petition is thus denied as to those fees.

### C.  Other Proceedings

Before delving into the issue of whether the government's position was substantially justified, we must pause to address Castañeda's arguments that he is entitled to an award for the fees he incurred during the administrative proceedings that followed Castañeda II and Castañeda IV, as well as the ones incurred during his habeas corpus and extradition proceedings.  We begin by analyzing whether he is eligible to recover the fees he incurred in the post-remand administrative proceedings that followed Castañeda IV.

### 1.  The post-Castañeda IV agency proceedings

Castañeda seeks an award for the attorneys' fees he incurred during the post-remand administrative proceedings that took place after Castañeda IV.  As previously discussed, a party may not rely on 5 U.S.C. § 504 to recoup fees expended during an immigration agency proceeding.  However, in Hudson, the Supreme Court held that certain administrative proceedings may be considered to form part of a "civil action" for which fees may be awarded under the EAJA.  490 U.S. at 892.  Castañeda thus relies on Hudson to argue that the post-remand administrative proceedings that followed our decision in Castañeda IV qualify as part of the civil action for which he is attempting to recover fees.  We agree with him and proceed to explain our reasoning.

In <u>Hudson</u>, a SSA case decided before <u>Finkelstein</u>, <u>Melkonyan</u> and <u>Schaefer</u>, the district court carried out a sentence four remand to the SSA agency, while retaining jurisdiction over the ensuing administrative proceedings. The petitioner was able to prevail on remand and subsequently filed an EAJA application for attorneys' fees with the district court, where, <u>inter alia</u>, he sought to recover the fees he incurred during the post-remand administrative proceedings. The <u>Hudson</u> court held that petitioner could recover such fees, and it established the following rule:

> [w]here a court orders a remand to the [agency] in a benefits litigation and retains continuing jurisdiction over the case pending a decision from the Secretary which will determine the claimant's entitlement to benefits, the proceedings on remand are an integral part of the "civil action" for judicial review, and thus attorney's fees for representation on remand are available subject to the other limitations in the EAJA.

490 U.S. at 892. The Court explained that certain qualifying administrative proceedings are "so intimately connected with judicial proceedings as to be considered part of the 'civil action' for purposes of a fee award." <u>Id.</u> Those qualifying classes of administrative proceedings were defined by the Court to be those "where 'a suit has been brought in a court,' and where 'a formal complaint within the jurisdiction of a court of law' remains pending and depends for its resolution upon the outcome of the administrative proceedings." <u>Id.</u>

Evidently, the holding in Hudson turned out to be at odds with later Supreme Court cases regarding sentence four remands, as Hudson sanctioned a district court's use of a sentence four remand while retaining jurisdiction over the post-remand agency proceedings. Recall that in Finkelstein, the Court held that a district court may not effectuate a sentence four remand while simultaneously retaining jurisdiction over the post-remand proceedings. 496 U.S. at 624-25. The Justices recognized this incongruity in Schaefer and thus decided to narrow the scope of Hudson, writing that they no longer "consider[ed] the holding of Hudson binding as to sentence-four remands that are ordered (as they should be) without retention of jurisdiction, or that are ordered with retention of jurisdiction that is challenged." Schaefer, 509 U.S. at 300.

The government argues that Hudson is now binding only as to sentence six remands where a court "does not rule in any way as to the correctness of the administrative determination," and remands the case to the agency for further fact-finding. Since Castañeda IV was not a sentence six remand, the argument goes, Castañeda may not rely on Hudson to recover the fees incurred in the post-remand administrative proceedings that followed that decision. This narrow reading of Hudson is mistaken.

Although the Court in Schaefer, in a footnote, stated that "Hudson remains good law as applied to remands ordered

-45-

pursuant to sentence-six," and that it was "limiting Hudson to sentence-six cases," we believe this language means that, in the context of a social security case, Hudson will only apply to sentence-six remand cases. Id. at n.4.[18]  In short, the Court in Schaefer did not rule that Hudson no longer applies to other types of remands outside of the social security sphere, particularly those remands that are not analogous to sentence four remands. As we have already concluded that the remand order in Castañeda IV is not comparable to a sentence four remand, the decision in Schaefer does not preclude Castañeda from relying on Hudson to reclaim the fees he incurred at the immigration agencies on remand.

What's left is that we are remitted to apply the factors enumerated in Hudson to determine whether the administrative proceedings conducted after Castañeda IV are so "intimately related" to the judicial proceedings in that case so as to be considered part of the same "civil action."  We conclude that the remand order in Castañeda IV squares nicely with the "qualifying administrative proceedings" outlined in Hudson.  The qualifying class of administrative proceedings were defined by the Court to be those "where 'a suit has been brought in a court,' and where 'a formal complaint within the jurisdiction of a court of law' remains

---

[18]  Moreover, the footnote seems to be inconsistent with the body of the opinion, which implies that Hudson may still apply to sentence four remands that are ordered, erroneously but without objection, with a retention of jurisdiction. See id.

-46-

pending and depends for its resolution upon the outcome of the administrative proceedings." 490 U.S. at 892. In Castañeda IV, a petition for review was brought before the court, and that petition for review remained pending due to our decision to remand the case back to the BIA while retaining jurisdiction over the petition. Had Castañeda failed to obtain relief before the immigration agencies, his petition for review before this court would have been reactivated, without the need for Castañeda to file a new petition. And had Castañeda prevailed at the agencies below, he still would have had to return to this court to seek a final judgment disposing of the petition for review. Therefore, the petition for review depended on the outcome of the administrative proceedings on remand for its resolution.

Additionally, when Castañeda IV was decided, Castañeda's application for asylum had been pending for almost twenty years and had already been addressed by two panels of this court, as well as an en banc panel. By that point, we had already provided ample guidance to the immigration agencies so that they could evaluate Castañeda's asylum claims. This, coupled with our decision to retain jurisdiction over the post-remand proceedings in Castañeda IV, as well as our directive ordering the parties to file periodic status reports on the progress of those proceedings, warrants finding that they were now "intimately related" with the judicial proceedings that book-ended them in Castañeda IV and Castañeda V.

Consequently, we conclude that Castañeda is eligible to recover the fees incurred during the post-remand agency proceedings that followed our remand order in Castañeda IV.

### 2. The post-Castañeda II agency proceedings

In addition to requesting attorneys' fees for the agency proceedings that followed our decision in Castañeda IV, Castañeda also seeks fees for the earlier agency proceedings that followed our decision in Castañeda II. However, since we have determined that Castañeda's fee application is untimely as to the fees expended in both Castañeda I and Castañeda II, we must also deem his application untimely as to the administrative proceedings that followed those decisions. Even assuming, without deciding, that those agency proceedings were "intimately related" to the judicial proceedings that preceded them, the fact remains that, under Hudson, those agency proceedings would still be part of a civil action for which recovery of fees is time-barred under the EAJA. Therefore, we deny Castañeda's fee application as to those fees.

### 3. Other Proceedings

Castañeda also seeks an award of attorneys' fees with respect to the habeas corpus and extradition proceedings that took place in the district court. He argues that the legal representation he received in those proceedings contributed to his ultimate victory in the asylum proceedings, and, as such, he should be able to include them in his fee application. The government,

for its part, argues that the EAJA precludes us from awarding fees incurred in proceedings over which we exercised no jurisdiction. In this regard, the government is correct.

The EAJA states that "a court shall award to a prevailing party . . . fees and other expenses . . . incurred by that party in any civil action . . . in any court having jurisdiction over that action . . . ." 28 U.S.C. § 2412(d)(1)(A). It follows that, "[i]n order for a court to award fees under the EAJA, it must have jurisdiction over the underlying action." Zambrano v. I.N.S., 282 F.3d 1145, 1149-50 (9th Cir. 2002); Lundin v. Mecham, 980 F.2d 1450, 1461 (D.C. Cir. 1992) (affirming general rule that "a court may not award fees under EAJA for work performed in other jurisdictions"); Lane v. United States, 727 F.2d 18, 20-21 (1st Cir. 1984). It is therefore clear that we may not award Castañeda the fees he incurred in the habeas corpus and extradition proceedings, because we never exercised jurisdiction over them.

The cases cited to by Castañeda, Hensley v. Eckerhart, 461 U.S. 424 (1983) and Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478 U.S. 546 (1986), are immaterial to the issue at hand, because neither of those two cases dealt with the EAJA. Additionally, in Hensley, the district court had jurisdiction over the proceedings at issue, and in Delaware Valley, the Supreme Court awarded petitioner the fees it incurred in certain administrative proceedings, because participation in those

-49-

proceedings was necessary to vindicate the petitioner's rights under a consent decree issued by the district court. Since neither case assists Castañeda, we must deny his petition as to the fees incurred in the habeas corpus and extradition proceedings.[19]

### D. Position of the United States

Having determined that Castañeda is eligible to recover the fees incurred in Castañeda IV, the administrative proceedings that followed, Castañeda V, and the current fee litigation, our inquiry now shifts to whether the government's position during those proceedings was substantially justified. See 28 U.S.C. § 2412(d)(1)(A). According to Jean, this entails making a single finding that will operate as a clear threshold for determining Castañeda's fee eligibility. 496 U.S. at 160. The government, however, failed to include any justification for its positions during any of the proceedings listed above in its opposition to Castañeda's fee petition.

It is well-settled that the government bears the burden of establishing that its position was substantially justified. See Pierce v. Underwood, 487 U.S. 552, 565 (1988); Dantran, Inc. v. U.S. Dep't of Labor, 246 F.3d 36, 41 (1st Cir. 2001). The government needs to satisfy this burden by a preponderance of the

---

[19] To the extent that Castañeda also seeks to be awarded the fees and expenses incurred with respect to his administrative bond proceedings, we must reject the request under the same reasoning. Although he did not specifically argue he was entitled to those fees, he does seem to include them in his fee schedule.

evidence, <u>Dantran</u>, 246 F.3d at 41, and it must justify the positions it took both during the litigation and the agency proceedings that preceded that litigation, <u>Schock</u> v. <u>United States</u>, 254 F.3d 1, 5 (1st Cir. 2001). These positions must have a reasonable basis in both law and fact. <u>Jean</u> v. <u>United States</u>, 396 F.3d 449, 455 (1st Cir. 2005).

In its opposition to Castañeda's application for attorneys' fees, the government only attempts to justify its position during the proceedings that led up to our decision in <u>Castañeda II</u>. In contrast, the government makes no attempt to justify its position during any of the proceedings for which Castañeda is eligible to recover fees, namely, the litigation that took place from <u>Castañeda IV</u> to <u>Castañeda V</u>. Given the government's failure in this regard, we conclude that its arguments as to the substantial justification issue are waived. <u>See</u> <u>United States</u> v. <u>Zannino</u>, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

In any event, the government would face an uphill battle arguing that its position in those proceedings was substantially justified. As previously recounted, in <u>Castañeda IV</u>, the government did not defend the BIA's decision on the merits; rather, it only argued that Castañeda's asylum petition should be held in abeyance pending the outcome of his extradition proceedings.

Although there are instances where a procedural argument that could affect our disposition of an appeal may be "substantially justified," it is clear to us that the procedural arguments raised by the government during Castañeda IV were not substantially justified. First, the government claimed that the case should have been held in abeyance because the BIA had a "policy" -- announced in Matter of Pérez-Jiménez, 10 I. & N. Dec. 309 (BIA 1963) -- of holding asylum applications in abeyance where there was a pending extradition attempt. However, as we pointed out in Castañeda IV, the BIA itself had explicitly declined to apply the Pérez-Jiménez rule to Castañeda when the government had previously petitioned the BIA to hold his petition in abeyance.

Second, the government argued that ruling on the asylum petition before the extradition proceedings were resolved would unduly interfere with foreign policy. We concluded, however, that the government offered little to support this argument beyond "vague hand-waving about the nature of [] unspecified foreign policy consequences." Castañeda IV, 638 F.3d at 360. We also noted that an asylum application had no preclusive effect whatsoever on an extradition proceeding. Moreover, the government conceded that, even if Castañeda were granted asylum, it would still be within the discretion of the Secretary of State to extradite him to Perú.

In sum, even if the government had adequately briefed the issue of whether its position was substantially justified, we would have no trouble ruling in favor of Castañeda in this regard. Castañeda thus merits being awarded attorneys' fees for each of the proceedings listed above.

### E. Special Circumstances

The government has not argued that there are any special circumstances which would make an award of fees against it unjust, and neither are we able to discern any. In fact, we believe the circumstances of this case actually militate in favor of granting Castañeda an award of attorneys' fees.

Consequently, we will now saunter over to the next issue: how to calculate Castañeda's award of attorneys' fees.

### V. Amount of Fees

The parties vigorously joust over how to calculate Castañeda's fee award, with Castañeda naturally wanting to increase the hourly rate for his attorneys' work while the government seeks to reduce it based on several alleged deficiencies in the fee application. Additionally, the government claims that Castañeda's fee award should be reduced because he unreasonably protracted the proceedings that led to his award of asylum. We begin by addressing Castañeda's argument that he should be awarded an enhanced fee for his attorneys' performance in this case.

## A. Enhanced Fee

Castañeda seeks to recover fees at a rate of $450 per hour for the work performed by his lead attorney, Mr. William Joyce, and $275 per hour for the work of Mr. Joyce's associates. Castañeda also petitions for fees at a rate of $130 per hour for paralegals and $100 per hour for law clerks, both of whom worked on his case. He claims these rates are in line with the prevailing market rates for immigration attorneys in the Boston area.

The EAJA, however, caps awards of attorneys' fees at a rate of $125 per hour. 28 U.S.C. § 2412(d)(2)(A). This statutory ceiling is generally "designed to hold down the government's costs by providing modest compensation, with exceptions." Atl. Fish Spotters Ass'n v. Daley, 205 F.3d 488, 491 (1st Cir. 2001). A court may only award fees beyond the statutory maximum if it "determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee." 28 U.S.C. § 2412(d)(2)(A). The Supreme Court has expanded on the "limited availability of qualified attorneys" exception, writing that

> [this] exception . . . must refer to attorneys 'qualified for the proceedings' in some specialized sense, rather than just in their general legal competence. We think it refers to attorneys having some distinctive knowledge or specialized skill needful for the litigation in question--as opposed to an extraordinary level of the general lawyerly knowledge and ability useful in all litigation. Examples of the former would be an

> identifiable practice specialty such as patent
> law, or knowledge of foreign law or language.
> Where such qualifications are necessary and
> can be obtained only at rates in excess of the
> [$125] cap, reimbursement above that limit is
> allowed.

Pierce, 487 U.S. at 572. The question thus becomes whether Castañeda's attorneys possessed some "distinctive knowledge" or "specialized skill" that was necessary to litigate the claims at stake during Castañeda IV, the administrative proceedings that followed, and Castañeda V. If we answer this question in the affirmative, then we must examine whether, in the case at hand, Castañeda could have found similarly qualified lawyers elsewhere in the market for $125 or less. See Atl. Fish Spotters, 205 F.3d at 492. To begin with, Castañeda argues that his attorneys deserve an enhanced award because they have been mired in particularly "lengthy and complex litigation" which required them to raise "precedential" arguments while litigating his case across a wide variety of legal fora. He highlights his attorneys' extensive experience in immigration law and their "resilient pursuit of a just result in the face of, and despite, a series of nearly a dozen discouraging events over the course of the nineteen years of [his] litigation." Their work product, he claims, could not have been obtained from other attorneys at or below the statutory rate.

In support of these assertions, Castañeda has included with his fee application several affidavits subscribed by his counsel, where they describe their ample experience in deportation

-55-

defense and the convoluted nature of this case. Castañeda also attached the affidavit of Mr. Harvey Kaplan, an experienced immigration attorney who is a partner at a Boston immigration firm, and who attests to Mr. Joyce's ample experience and the complicated nature of this case. He also asserts that the rates requested for Mr. Joyce and his associates are "at or below the prevailing market rate for the period of 2005-2012 for attorneys of their respective experience levels involved in highly specialized litigation."

Having reviewed Castañeda's submissions, we find that he has failed to establish that his attorneys possessed some "specialized skill" or "distinctive knowledge" needful for the litigation in question. Although Castañeda does convince us that representing him required a herculean effort from his counsel in staying the course and persevering until the end -- given the two-decades' long proceedings, his years of imprisonment, and the adverse determinations that were repeatedly made against him -- he does not explain how "distinctive knowledge" or "specialized skill" was necessary to represent him during the specific proceedings at issue here. Instead, Castañeda stresses the complexity and interdependence of all of the proceedings he underwent as a whole, emphasizing that very few attorneys in the immigration bar are equipped to litigate an immigration case at the administrative level while also "competently handling multi-faceted federal litigation," including the habeas corpus and extradition

proceedings he faced.  We, however, cannot avow Castañeda's holistic approach because the EAJA requires us to focus on whether Castañeda's attorneys possessed some "specialized skill needful for the litigation in question."  Pierce, 487 U.S. at 572 (emphasis added).  In this case, we have already determined that "the litigation in question" must be confined to the proceedings that sprouted from his second petition for review, i.e., the proceedings that led to our decision in Castañeda IV, the "intimately related" administrative proceedings that followed, and the Castañeda V proceedings.

As to those proceedings, particularly the litigation in Castañeda IV, Castañeda argues his attorneys made the "unprecedented" argument that, "contrary to the application of established BIA case law, there should be no per se bar on asylum claims for refugees simply because of their employment in the military or police forces in their country of origin."  He claims this argument "was not straightforward" and "required a highly nuanced application of statutory, regulatory and case law."  But the Supreme Court has determined that factors such as the "novelty and difficulty of issues, the undesirability of the case [and] the work and ability of counsel" do not, by themselves, merit awarding fees beyond the statutory cap.  Pierce, 487 U.S. at 573 (internal quotation marks omitted).

-57-

Furthermore, in Castañeda IV, the main issues were whether Castañeda's petition for review should be held in abeyance pending the resolution of the extradition proceedings against him, and whether Castañeda had established the requisite nexus between his past persecution and his membership in a cognizable particular social group. As to the first issue, we have already pointed out that the government offered very little in support of its argument for a stay and that it even conceded that asylum and extradition proceedings are "separate and distinct," such that a decision on the former has no preclusive effect on the latter. Castañeda IV, 638 F.3d at 360-62. As to the second issue, although it was difficult, the government is correct in characterizing it as one that is routinely litigated in our circuit by a diverse cast of immigration attorneys. Therefore, we are not convinced that the proceedings in Castañeda IV "require[d] for competent counsel someone from among a small class of specialists who are available only for [$450] per hour." Atl. Fish Spotters, 205 F.3d at 492.

We also do not see how any "special skill" or "distinctive knowledge," apart from that obtained by immigration lawyers pursuant to their general experience, was necessary to prevail in Castañeda IV. As Castañeda does not set forth any similar arguments with respect to the administrative proceedings that followed Castañeda IV or the proceedings in Castañeda V, we

find that he is not entitled to an award of enhanced fees under the EAJA's "special factor" provision.

### B. Cost-of-Living Allowance

The above is not the end of the matter, however, as the EAJA also provides for enhanced fees based on an increase in the cost of living. 28 U.S.C. § 2412(d)(2)(A). Castañeda thus makes the alternative argument that the $125-per-hour cap established by Congress in March of 1996 should be adjusted to reflect the increase in the cost of living that has occurred since then, particularly in the Boston area. He relies on the Consumer Price Index (CPI) data compiled by the U.S. Bureau of Labor Statistics.

Given that the government does not oppose Castañeda's request for a cost-of-living adjustment, or that said adjustment be computed based on the regional, as opposed to national, CPI, we find that Castañeda is eligible for the requested enhancement. See Sierra Club v. Sec'y of Army, 820 F.2d 513, 523 (1st Cir. 1987) ("[F]ederal courts remain able to augment hourly rates by considering changes in the cost of living . . . ."). We therefore adjust the $125 statutory cap to reflect the increase in the cost of living experienced in the Boston - Brockton - Nashua geographic area since March of 1996, as established by the Bureau of Labor Statistics. The Annual Consumer Price Index for all Urban Consumers (CPI-U) in this area, for the month of March in 1996, was

162.8.[20] Castañeda's attorneys worked on the proceedings for which he is eligible to recover attorneys' fees during 2009, 2010, 2011 and 2012. The CPI-U for those years is 233.778, 237.446, 243.881 and 247.733, respectively. We therefore divide each of these numbers by 163.3 and multiply the results by $125, to arrive at the EAJA's statutory cap for each of the relevant years, adjusted for inflation. Having completed this exercise, we determine that Castañeda is eligible to recover fees at the following rates: $179.50 per hour for work completed in 2009; $182.31 per hour for work completed in 2010; $187.26 per hour for work completed in 2011; and $190.21 per hour for work completed in 2012. These rates will apply equally to Mr. Joyce and his associates' work.

### C. Paralegals and Law Clerks

Moving on, Castañeda requests hourly rates of $130 for paralegals and $100 for law clerks. He relies on Mr. Kaplan's affidavit in claiming that such rates are in accordance with the prevailing market rates for immigration firms in the Boston area. The government opposes the request, arguing that Castañeda has not advanced sufficient evidence to prove that those rates are in fact comparable to the prevailing market rates. It notes that Mr.

---

[20] This data may be obtained by visiting the Bureau of Labor Statistics' website for the New England Information Office. See http://www.bls.gov/ro1/. There, one may use the Data Search Tool and select the "(CPI-U) Boston-Brockton-Nashua, MA-NH-ME-CT, All items 1982-84=100 - CUURA103SA0" database to access historical CPI-U values for the Boston-Brockton-Nashua geographic area. See http://www.bls.gov/ro1/data.htm.

Joyce's affidavit does not attest to the rates charged by the paralegals and law clerks who worked on the case and that the case law cited by Castañeda in the alternative instead supports rates of $90 and $60 per hour, respectively, in the Boston area. The government seems to have the better argument in this regard.

In Richlin Security Services Co. v. Chertoff, 553 U.S. 571 (2008), the Supreme Court held that the EAJA allows a prevailing party to recover fees incurred for paralegal services at the market rate for such services.[21] The Court has also determined, while analyzing a similar fee-shifting statute, that fees expended on law clerks and other individuals who contribute to the attorney's work product are recoverable at market rates. See Missouri v. Jenkins, 491 U.S. 274, 285 (1989) (holding that "reasonable attorney's fee" under 42 U.S.C. § 1988 "must take into account the work not only of attorneys, but also of secretaries, messengers, librarians, janitors, and others whose labor contributes to the work product for which an attorney bills her client"); Nadarajah v. Holder, 569 F.3d 906, 918 (9th Cir. 2009).

---

[21] The Supreme Court based its decision on the language of 5 U.S.C. § 504(a)(1), which is the operative provision of the EAJA that allows prevailing parties to recover fees expended during administrative proceedings. The Supreme Court stated that it "assume[d] without deciding" that the reasoning of its opinion would extend equally to 28 U.S.C. § 2412, the provision at issue in this case. The government does not seem to dispute that this is the case, and we can discern no reason for not construing Richlin's holding to be applicable to EAJA petitions filed under § 2412.

The government is correct in pointing out that none of Castañeda's attorneys attest to the rates charged by Mr. Joyce's firm for paralegal and law clerk services in their affidavits. Although Mr. Kaplan states that "the rates requested for paralegals ($130) and law clerks ($100), are also in accord with prevailing market rates for immigration litigation firms in Boston," some recent district court cases from Massachusetts suggest that rates of $100 for paralegals and $75 for law clerks are more in line with current market trends. See Rogers v. Cofield, --- F. Supp. 2d ---, 2013 WL 1325034 at *21 (D. Mass. March 31, 2013) (finding a $100 hourly rate for paralegal work reasonable); Ferraro v. Kelley, 2011 WL 576074 at *6 (D. Mass. Feb. 8, 2011) (finding a $90 rate for paralegals to be "in the ball park of rates approved recently for paralegals in this District."); Walsh v. Boston Univ., 661 F. Supp. 2d 91, 113 (D. Mass. 2009) (finding that a $75 hourly rate is "in line with rates approved for legal interns"); Hudson v. Dennehy, 568 F. Supp. 2d 125, 133 (D. Mass. 2008) (finding prevailing market rates for paralegals during 2007-2008 to be $100 per hour). Accordingly, we find that Castañeda should be awarded fees for paralegals and law clerks at the hourly rates of $100 and $75, respectively.

**D. Government's Arguments for a Fee Award Reduction**

We now consider whether the government is correct in claiming that Castañeda's fee award must be reduced because (1) he

unreasonably protracted the proceedings; (2) his fee application does not appear to consist of contemporaneous time records; (3) his fee application contains excessive or duplicative time entries; (4) he did not prevail in his claim for an enhanced fee award; and (5) his statement of costs is defective.  We discuss these arguments in turn.

### 1. Protraction of Proceedings

The government argues that Castañeda's fee award must be reduced because he "unreasonably protracted the litigation in Castañeda [IV] by opposing the government's request for a voluntary remand."  It relies on 28 U.S.C. § 2412(d)(1)(C), which allows courts to reduce or deny an award of attorneys' fees if the prevailing party, during the course of the proceedings, "engaged in conduct which unduly and unreasonably protracted the final resolution of the matter in controversy."  Following Castañeda's second petition for review of the BIA's May 2009 decision, the government notes it filed a motion to voluntarily remand the case to the BIA so that the Board could further evaluate whether Castañeda had established the requisite nexus component of his asylum claim.  This court provisionally denied the motion on May 20, 2010 and ordered the parties to brief the merits of Castañeda's petition for review.  Notwithstanding, the government faults Castañeda for opposing the motion, arguing that he delayed the

resolution of his claims and as a result incurred unnecessary fees and expenses.  We strenuously disagree.

The government's three-page motion to remand was based almost exclusively on the case of Sompotan v. Mukasey, 533 F.3d 63 (1st Cir. 2008), which dealt with the nexus requirement in a pre-REAL ID Act case.  However, as we explained in Castañeda V, Sompotan "simply re-stated well-settled law and pre-dated the BIA's [May 2009] decision"  676 F.3d at 3.  Moreover, when the government sought remand, Castañeda's petition for asylum had been pending for approximately seventeen years, the last four and a half of which he had spent in the DHS' custody, despite an administrative determination that he was not a danger to the community nor a flight risk.  It is therefore perplexing for us to think that Castañeda would voluntarily choose to delay the resolution of his own claims, given the precarious situation in which he found himself. Instead, we find that the immigration agencies' repeatedly erroneous determinations, as well as the government's initiation of the extradition proceedings against Castañeda and its repeated opposition to his release on bail are what caused the delay inherent in these proceedings and the substantial petition for attorneys' fees that is now before this court.

We therefore reject the government's contention that Castañeda unduly protracted the proceedings in this case.

## 2. Contemporaneous Time Records

The government also attacks the fee schedule submitted by Castañeda, arguing that it does not appear to consist of contemporaneously-kept time records.  Instead, the government suggests that "the summaries of the hours expended appear to be a reconstruction of the time records in this case."  It relies on the case of Grendel's Den, Inc. v. Larkin, 749 F.2d 945, 952 (1st Cir. 1984), where we held that, "in cases involving fee applications for services rendered after the date of this opinion, the absence of detailed contemporaneous time records, except in extraordinary circumstances, will call for a substantial reduction in any award or, in egregious cases, disallowance."  We thus proceed to discuss the adequacy of the submitted time records.

Pursuant to the EAJA, an application for fees must include "the amount sought, including an itemized statement from any attorney . . . stating the actual time expended and the rate at which fees and other expenses were computed." 28 U.S.C. § 2412(d)(1)(B); see also Local Rule 39.1.  This itemized statement must be a "full and specific accounting" of the tasks performed, including "the dates of performance, and the number of hours spent on each task" as well as a description of the nature of the tasks. Weinberger v. Great N. Nekoosa Corp., 925 F.2d 518, 527 (1st Cir. 1991. The statement must also consist of "detailed contemporaneous time records" explaining how time was spent on each claim in the

case.  Grendel's Den, 749 F.2d at 952; Hensley, 461 U.S. at 437.

Contemporaneous time records serve not only as evidence that the "time claimed was indeed so spent, but [also] provide details about the work . . . . [t]his allows the paying party to dispute the accuracy of the record as well as the reasonableness of the time spent."  Calhoun v. Acme Cleveland Corp., 801 F.2d 558, 560 (1st Cir. 1986).  Records that include the different tasks each attorney performed, the total number of hours billed, the billing rate for those hours, the date on which each tasks was performed, and the amount of time spent on each task generally fulfill this requirement.  Id. at 560.

Having reviewed the time records submitted by Castañeda, we are confident that they satisfy the strictures set forth above. The records are divided according to the attorney, paralegal or law clerk that worked on the case, and their time entries are classified according to the year in which they were performed. Further, each time entry lists a general description of the task, such as "Prepared for oral argument before the First Circuit" or "Drafted motion for expedited bond hearing," as well as the date on which each was performed.  Each task also lists the hours that were allotted to it, and the rate at which those hours were billed. Therefore, we find that the records in this case are sufficiently detailed to allow the government to "dispute the accuracy of the records as well as the reasonableness of the time spent."  See

Lipsett v. Blanco, 975 F.2d 934, 938 (1st Cir. 1992); Hensley, 461 U.S. at 437 ("[C]ounsel . . . is not required to record in great detail how each minute of his time was expended [but] at least counsel should identify the general subject matter of his time expenditures."); Gay Officers Action League v. Puerto Rico, 247 F.3d 288, 297 (1st Cir. 2001) (stating that while it is required to keep detailed contemporaneous records, compilations that accurately reflect the records and simplify the presentation of data may be accepted by the courts instead of the original records). In fact, the government has launched challenges to the reasonableness of the hours allotted to certain tasks, and we proceed to analyze these objections in the following section.

### 3. Duplicative or Excessive Time Entries

The government objects to the reasonableness of several of the time entries made by Castañeda's attorneys, claiming that they are either excessive or duplicative. However, most of these challenges relate to hours expended on proceedings for which we have already held that Castañeda is ineligible to recover fees. In light of our holding that Castañeda's petition for attorneys' fees must be circumscribed to the proceedings in Castañeda IV, the "intimately related" post-remand administrative proceedings that followed, and Castañeda V, we determine that only the following two objections are relevant:

> 1. Four hours on September 13, 2010 for Mr. Joyce to present oral argument before this

> court; two hours for Ms. Endy to attend the
> same oral argument (for six hours total).
>
> 2.  Four and a half hours on December 20, 2011
> for Mr. Joyce and Ms. Endy to attend an
> "[i]ndividual hearing before IJ Feder." (for
> nine hours total).

The government contends that two attorneys were not necessary to adequately represent Castañeda at these hearings.  It also claims that four hours is an excessive amount of time to argue a case before this court "inasmuch as the arguments did not take up more than a small fraction of that time."  The government thus suggests that these hours include travel time, which should not be billed at the full attorney rate.  We disagree with the government and find the time entries above to be reasonable.

Fee awards are not intended "to serve as full employment or continuing education programs for lawyers and paralegals." Lipsett, 975 F.2d at 938 (1st Cir. 1992).  We have already emphasized that the assignment of multiple attorneys to a single set of tasks should be regarded with "healthy skepticism," and that "staffing issues are often best resolved by the [] court's application of its intimate, first-hand knowledge of a particular case's nuances and idiosyncracies."  Id.  We have added that "[t]ime spent by two attorneys on the same general task is not . . . per se duplicative" since "[c]areful preparation often requires collaboration and rehearsal," especially in response to complex legal issues that are fiercely defended. Rodríguez-Hernández v.

-68-

<u>Miranda-Vélez</u>, 132 F.3d 848, 860 (1st Cir. 1998); <u>Hutchinson ex rel. Julien</u> v. <u>Patrick</u>, 636 F.3d 1, 14 (1st Cir. 2011) ("[P]arties sometimes are justified in making a strategic choice to use teams of lawyers in various phases of complex litigation").

We hold that Ms. Endy's presence at oral argument and at the hearing before IJ Feder was not unnecessarily duplicative, given the complicated nature of the case and the serious ramifications the outcome of the hearings had on Castañeda's future. On September 13, 2010, for example, Castañeda not only faced the impeding threat of deportation, but he was also the target of the government's efforts to extradite him to Perú, where he would again be charged for his role in the Accomarca Massacre. Moreover, it is understandable that both Mr. Joyce and Ms. Endy attended the hearing; Ms. Endy clocked almost twice the number of hours on the case compared to Mr. Joyce, and no doubt she was more familiarized with the case and thus could have provided valuable assistance to Mr. Joyce during the hearings.

We also hold that billing four hours to attend oral argument before this court is reasonable, even though the actual argument time was considerably less. Oral arguments scheduled before this court usually begin at 9:30 am and can sometimes last until after noon. Mr. Joyce's allotment of four hours seems to be in the ballpark for attorneys who sit in for the full duration of their argument, usually waiting for their case to be called. We

agree with Castañeda that such time is "necessary and unavoidable in litigation."  See Brewster v. Dukakis, 3 F.3d 488, 492 n.4 (1st Cir. 1993) (identifying court appearances as a "core work" that is worthy of full reimbursement).

Therefore, we find that the government's challenges to the time entries listed above are without merit.

### 4. Reduction of Hours Expended on Amended Petition

As previously noted, Castaneda filed an amended application for attorneys' fees after he had filed his original petition.  The main difference between the two petitions is that, on the amended petition, Castañeda sought a fee enhancement based on the EAJA's "limited availability of qualified attorneys" exception to the $125 statutory cap.[22]  Since Castañeda was not successful in obtaining the requested fee enhancement, the government now argues that we should deny Castañeda the specific fees incurred in the drafting of the amended petition.  The government cites to Cooper v. United States Railroad Retirement Board, 24 F.3d 1414, 1418 (D.C. Cir. 1994), where the D.C. Circuit reduced the amount of hours billed on an amended application for attorneys' fees, from 21 hours to 7 hours, because said application mainly requested fees for proceedings in which the petitioner did not qualify as a prevailing party.

---

[22]  In addition, Castañeda's amended petition seemed to include a significantly longer "procedural history" section.

Examining the records, it seems that Ms. Endy devoted 2.5 hours to working on the amended petition, while law clerk Brian Doyle devoted 16 hours to it. We therefore find it reasonable to reduce Mr. Doyle's hours by eight hours, but we decline to reduce the hours billed by Ms. Endy, due to the minimal amount of time she devoted to the amended petition. Accordingly, Mr. Doyle's total hours for 2012 are reduced by eight.

## 5. Costs

This brings us to the government's final challenge. It notes that Castañeda has requested almost $5,000 in "costs and fees," but that none of the itemized statements are supported with any documentation or are explained in sufficient detail to indicate for what purpose they were incurred. We agree with the government that this is the case, and that the costs, as presented, are invalid. Nevertheless, Castañeda has represented that

> Petitioner is prepared to submit actual time records and documentation in support of expenses in discovery or upon a court order. For the sake of efficiency and due to the length of litigation, the breadth of the Petitioner's itemized statements, and the varying administrative and judicial phases of this litigation, Petitioner's counsel deemed it more efficient to first allow the Court to decide, as a threshold issue, the portions of the Castañeda litigation where Petitioner may recover fees before litigating recordkeeping and fee disputes. As such, Respondent's argument that Petitioner's itemized statement is not supported by contemporaneous time records and other supporting documentation is premature at best.

-71-

We therefore order Castañeda to submit a new itemized statement of attorneys' fees and expenses which conforms to the strictures of this opinion. His new statement of fees shall only include the attorneys' fees that were expended representing him in the proceedings that led to our decision in <u>Castañeda IV</u>, the "intimately related" post-remand administrative proceedings that followed, the proceedings in <u>Castañeda V</u> and the current fee litigation. If Castañeda wishes to also recover costs, he shall file an itemized statement of costs that includes supporting documentation and an appropriate description of those costs. The government shall have an opportunity to impeach any costs it deems improvident.

## VI. <u>Conclusion</u>

For the reasons set forth above, Castañeda's petition is granted in part and denied in part. Castañeda shall have twenty (20) days following the publication of this opinion to comply with the order contained herein.

**<u>So ordered</u>**.